# Exhibit "B"

<u>PRODUCER'S AGREEMENT</u>

Date: January 19, 2012

Ruben D. Sosa, Jr.

██████████████████████

Dear Mr. Sosa:

Intending to be legally bound hereby, the following shall constitute the agreement of **Ruben D. Sosa, Jr. p/k/a CITO ON THE BEAT**, (hereinafter "you" or "Producer") on the one hand and **In The Struggle Productions, LLC**, with an address of ████ ██████████████████ (hereinafter known as "us," "we" or "Company") with respect to your producing for us during the term of this contract master recordings embodying the performances of various artists (hereinafter referred to as the "Artist").

1. (a) The term of this contract shall commence as of the date hereof and shall continue for a period of two (2) years (the "Term"). We shall have the option to extend the Term of this agreement for two (2) additional periods of one (1) year each. Each option shall be deemed automatically exercised unless we give written notice to the contrary to you not less than thirty (30) days prior to the expiration of the then current Term. You shall at all times diligently, competently, and to the best of your ability perform the services required to be performed by you hereunder. Notwithstanding anything to the contrary contained herein, it is agreed that:

(i) Company may terminate this Agreement, at any time, by giving Producer at least three (3) weeks prior written notice with respect thereto. Any such termination, as herein provided (or as otherwise provided in this Agreement), shall be subject to existing agreements entered into by us, and Producer (notwithstanding such termination) agrees to be bound by such agreements insofar as they may affect you or relate to your services, and you agree to render your services as and when required therein.

(b)  You acknowledge that we are not currently engaged in the distribution of records; we may, however, attempt to sell, license or otherwise transfer our master recordings to record companies who act as distributors.  You further acknowledge that we may enter into agreements with record companies (hereinafter the "Distributor") for the manufacture, sale and distribution of the master recordings to be produced by you hereunder.

2.  During the term hereof you shall produce such number of master recordings embodying the performances of various Artists (hereinafter sometimes referred to as the "Masters," "master recordings," "Master Recordings" or "Master recordings") as we shall designate.

3.  (a)  Recording sessions for the Masters shall be conducted by you under the recording license designated by us and at such times and locations as shall be designated by us. All individuals rendering services in connection with the recording of the Masters shall be subject to our approval.  We shall have the right and opportunity to have our representatives attend each such recording session.  Each Master shall embody the performance by the Artist of a single musical composition designated by us and shall be subject to our approval and Distributor's as commercially and technically satisfactory for the manufacture and sale of phonograph records, and, upon our request, you shall re-record any musical composition or other selection until a Master commercially and technically satisfactory to us and Distributor shall have been obtained.

(b)  Upon our request, you shall cooperate with us in preparing all union contract forms and report forms for recording sessions hereunder (including, but not limited to, I-9's, W-4's, AFTRA and AFM session reports) and all bills pertaining to such recording sessions.  As between you and us, we shall be responsible for the payment of all recording costs with respect to the Masters, subject, however, to the foregoing and to the provisions of subparagraph (c) below.

-2-

(c)   No recording sessions shall be commenced hereunder nor shall any commitment be made or costs incurred in connection therewith unless and until a proposed recording budget for the Masters to be recorded at such session shall have been submitted by you in writing and approved in writing by us and the Distributor.   We shall not be responsible for payment to any individuals rendering services in connection with the recording of the Masters which exceed union scale unless such excess and the proposed recipient thereof are specified in said budget and approved by us.   In the event the recording costs of any Masters shall, for any reason within your control, exceed the approved budget therefor, you shall, upon our demand, promptly reimburse us for all such excess costs or we may, at our election, deduct an amount equal to such excess costs not so reimbursed by you from any and all monies payable to you hereunder.

(d)   You shall deliver to us, for each Master, a two-track stereo tape, all master tapes (including all 24-track master tapes) and, upon our request, a monaural tape.   All original session tapes and any derivatives or reproductions thereof also shall be delivered to us, or, at our election, maintained at a recording studio or other location designated by us, in our name and subject to our control.

4.   All master recordings produced by you hereunder from the inception of the recording thereof, and all phonograph records and other reproductions made therefrom, together with the performances embodied therein and all copyrights therein and thereto, and all renewals and extensions thereof, shall be entirely our property, free of any claims whatsoever by you or any other person, firm, or corporation.   We or our designee shall, accordingly, have the sole and exclusive right to copyright such master recordings, phonograph records, or other reproductions, in our or our designee's name, as the owner and author thereof, and to secure any and all renewals and extensions of such copyrights, it being understood that for such purposes that all such master recordings produced or created hereunder shall be considered works for hire.   Nevertheless, you shall, upon our request, execute and deliver to us any assignments of copyright (including renewals and extensions

-3-

thereof) in and to such master recordings as we may deem
necessary, and, you hereby irrevocably appoint us your attorney-
in-fact for the purpose of executing such assignments in your
name.  Without limitation of any of the foregoing, we and/or our
designees shall have the exclusive worldwide right in perpetuity
to manufacture, sell, distribute, and advertise phonograph
records or other reproductions (visual and non-visual) embodying
such master recordings, to lease, license, convey or otherwise
use or dispose of such master recordings by any method now or
hereafter known, in any field of use, to release phonograph
records or other reproductions embodying such master recordings
under any trademarks, trade names, or labels, to perform such
phonograph records or other reproductions publicly, and to
permit the public performance thereof by radio or television
broadcast, or any other method now or hereafter known, all upon
such terms and conditions as we may approve, and to permit any
other person, firm, or corporation to do any or all of the
foregoing or we may refrain from doing any and all of the
foregoing.

        5.    We shall have the worldwide right in perpetuity
to use and to permit others to use your name (both legal and
professional, and whether presently or hereafter used by you),
likeness, other identification, and biographical material
concerning you, for purposes of trade and otherwise without
restriction in connection with the Master recordings hereunder,
the phonograph records derived therefrom (including derivatives,
such as videos), our record business and the record business of
our respective Distributors and licensees, including goodwill
and industry-related advertising.  We shall use our best efforts
to cause the Distributors to give you appropriate production or
co-production credit on record labels and album cover liner
notes.  No inadvertent failure on the Distributor's part to
fulfill such obligations under this paragraph shall be deemed a
breach of this contract, with the understanding that we will
cause the Distributor to endeavor to correct any such
inadvertent failure on future runs after we or the Distributor
have been notified by you in writing of any such failure.  All
such credit to you shall be substantially in the form of
"Produced by **Citoonthebeat** for In The Struggle productions
unless you co-produced a master or masters in which case the

-4-

credit may read "Produced by _____ for _____ and by _____ for In The Struggle Productions" or it may read "Co-Produced by _____ and by _____ for In The Struggle Productions."

      6.    (a)  For and in consideration of the full performance by you of all of your obligations hereunder, in the event that you shall produce Masters, which Masters are embodied on a commercially released record, we shall pay you an advance equal to 1% of the line production master fee for such master paid by Distributor, payable upon your delivery to us and our acceptance thereof, provided you shall only be paid after we are paid by Distributor; all such advances you receive shall be fully recoupable against your royalties hereunder. Notwithstanding the foregoing, if you co-produce a master with another producer, the line producer master fee payable to you will be calculated by multiplying the total line producer fee for such master payable by Distributor times a fraction the numerator of which is one (1) and the denominator of which is the number of co-producers (including you), payable after your delivery and our acceptance of such master and after we are paid by Distributer. Notwithstanding the forgoing, while Artist is entitled to 1% of the line production master fee hereunder, Artist hereby waives Artist's percentage of the line production fee and shall not receive any portion of the line production fee hereunder.

      (b) Notwithstanding the forgoing, solely with respect to your services provided herein, we shall pay you 1% of all monies generated from studio use, including but not limited to studio time, demo fees, engineering fees, etc. Notwithstanding the forgoing, while Artist is entitled to 1% of all monies generated hereunder, Artist hereby waives Artist's percentage of all monies generated and shall not receive any portion of the line production fee hereunder.

(c)  Nothing herein contained shall constitute a partnership, joint venture, fiduciary or employer-employee relationship between you and us.  You are performing your obligations hereunder as an independent contractor, having full responsibility to account and pay for your own taxes. Notwithstanding the foregoing, we shall have the right to deduct or withhold from any amounts payable to you hereunder any amounts we are required to deduct under any statute, regulation, treaty or other law, or under any union or guild agreement.

7.   Conditioned upon your full and faithful performance of all of the material terms and provisions hereof, you shall be paid in respect of the sale by us or our Distributor or our Distributor's licensees of phonograph records embodying the Masters recorded hereunder and in respect of any other exploitation by us, our Distributor, or our licensees or our Distributor's licensees of such Masters, the following royalties upon the terms hereinafter set forth:

(a)  With respect to each Master produced for third party projects, you shall receive a producer royalty equal to 1% of the line producer's royalty payable by the Distributor for such Master multiplied times a fraction the numerator of which is one (1) and the denominator of which is the number of producers of such master (including you) (the "Fraction"). Your royalty (the "Basic Royalty Rate") shall be based on the suggested retail list price from time to time in respect of sales of records embodying the Master(s) on LPs sold through normal retail channels in the United States (such sales are hereinafter referred to as "U.S. LP Retail Sales"); as used herein, the term "through normal retail channels in the United States" shall refer to sales of records on top line labels through our or the Distributor's customary distributors for resale at full price through record and other retail stores. Notwithstanding the forgoing, while Artist is entitled to 1% of the line producer royalty hereunder, Artist hereby waives Artist's percentage of the line producer royalty and shall not receive any portion of the line producer royalty hereunder.

-6-

(b)   Except as provided hereinabove, your royalty for sales of records embodying Masters shall otherwise be reduced, computed or otherwise determined in the same manner and on the same terms as is our royalty in respect of such sales (without regard to any escalations of our such royalty).  As used herein, the term "computed" shall include all reductions in royalties or royalty base price provided for in the agreement with Distributor, including, but not limited to, any reductions thereunder for packaging or container charges, but shall expressly not include any escalations.

(c)   Notwithstanding the foregoing, in the event that we or the Distributor shall license a Master on a flat fee or a net royalty basis, your royalty in respect thereof shall be an amount equal to one percent (1%) of the net flat fee or net royalty, as the case may be, received or credited to our account against advances previously received by us as our royalty in respect of a particular such license multiplied by the Fraction. Notwithstanding the forgoing, while Artist is entitled to 1% of the net flat fee hereunder, Artist hereby waives Artist's percentage of the net flat fee and shall not receive any portion of the net flat fee hereunder.

(d)   Without limiting the generality of the foregoing, the royalty payable to you hereunder with respect to any phonograph record embodying Masters hereunder together with other master recordings shall be computed by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which shall be the number of Masters made hereunder which are embodied on such phonograph record and the denominator of which shall be the total number of master recordings (including the Masters) embodied on such phonograph record.

(e)   Notwithstanding any of the foregoing, in the event any other producer(s) shall perform additional services with respect to any of the Masters produced by you hereunder, then the royalty payable to you hereunder with respect to such Masters shall be reduced by the royalty payable to such other producer(s).

(f)   Without limiting the generality of anything contained in this contract, you shall not be entitled to any monies in respect of any exploitation of the Masters for which we are not entitled to receive or do not earn a royalty.

(g)   Notwithstanding any of the foregoing, no royalty shall be payable to you hereunder unless and until all recording costs incurred with respect to the Masters shall have been recouped by the Distributor from Artist's "Net Royalties" earned in respect of all masters including the Masters on a particular record. As used herein, the term Artist's "Net Royalties" shall mean, with respect to any Master and any particular use thereof, the royalty payable to Artist pursuant to Artist's agreement with Distributor less the royalties payable to you and any other line producer, remixer or other royalty participant rendering services in connection with a record. Upon such recoupment of said recording costs, we shall thereafter credit to your account for payment, at the next regular accounting date hereunder, all royalties, if any, earned by you hereunder and payable to us by Distributor. Notwithstanding the foregoing, you shall only be paid royalties to the extent that royalties earned by you hereunder shall exceed any advances paid to you or on your behalf under this Agreement.

8.   (a)   Statements as to royalties payable hereunder shall be sent by us to you on a semi-annual basis, within sixty (60) days after our receipt from Distributor of statements for the corresponding semi-annual period. Statements shall be accompanied by a payment of accrued royalties, if any, earned by you hereunder during such semi-annual period, less all advances and charges under this contract. We shall have the right to retain, as a reserve against charges, credits, or returns, such portion of payable royalties as shall be reasonable in our best

business judgment; provided, however, we shall not retain any such reserves in excess of an amount retained by the Distributor. You shall not have the right to audit the books or records of the Distributor. However, a certified public accountant on your behalf, may, at your sole expense, upon reasonable written notice to us, examine royalty statements sent to us by the Distributor in connection with the sale of phonograph records hereunder, but solely with respect to those portions of such statements specifically pertaining to royalties payable to you hereunder. We shall have no obligation to permit you to examine any such particular royalty statement more than once. You understand and agree that in our rendering statements to you, we will be relying on statements provided to us by the Distributor. Accordingly, notwithstanding anything to the contrary contained in paragraphs 8(b) and 8(c) hereof, the statements which we render to you shall be deemed accurate, and you shall have no right to object thereto, insofar as the statements rendered by us are accurate based on information provided to us by the Distributor.

(b)  You shall be deemed to have consented to all royalty statements and all other accountings rendered by us hereunder and each such royalty statement or other accounting shall be conclusive, final, and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by you to us within one (1) year after the date rendered. No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by us hereunder may be maintained against us unless such action, suit, or proceeding is commenced against us in a court of competent jurisdiction within two (2) years after the date rendered.

(c)  We shall maintain books of account concerning the sale of phonograph records hereunder. A certified public accountant on your behalf, may, at your sole expense, examine our books relating to the sale of records hereunder (but excluding any of our books or records relating to the manufacture of records hereunder) solely for the purpose of verifying the accuracy thereof, only during our normal business hours and upon reasonable written notice, and in conjunction

with and at the same time as any such examination by Artist. Our books relating to any particular royalty statement may be examined as aforesaid only within two (2) years after the date rendered and we shall have no obligation to permit you to so examine our such books relating to any particular royalty statement more than once.  The rights hereinabove granted to you shall constitute your sole and exclusive rights to examine our books and records.

> (d)  All monies paid to you or on your behalf or to or on behalf of any person, firm or corporation representing you, other than royalties payable pursuant to this contract, shall constitute advances recoupable from any sums payable under this contract, unless we otherwise consent in writing.

> 9.  Each selection recorded in any Master hereunder which is written or composed by you, in whole or in part, alone or in collaboration with others, or which is owned or controlled, in whole or in part, directly or indirectly, by you or any person, firm or corporation in which you have a direct or an indirect interest is hereinafter referred to as a "Producer's Controlled Composition."  Each Producer's Controlled Composition shall be licensed to us and, at our election, our Distributor or licensee, if applicable, for the United States at the applicable copyright royalty rate and all other terms and provisions (including without limitation 3/4 rate and mechanical royalty caps) as set forth in our agreement with Distributor or Artist or which is applicable to the Artist, on the basis of records sold, less returns and credits, except that no copyright royalties shall be payable in respect of any records for which no royalties are payable pursuant to the so-called "Controlled Composition" clause in the agreement with Distributor or Artist, as the case may be.

> 10.  (a)  You are under no disability, restriction, or prohibition, whether contractual or otherwise, with respect to your right to execute this contract and to grant the rights granted by you to us hereunder, to perform each and every term and provision hereof, and to produce each and every selection produced by you hereunder.  In this regard, you specifically warrant and represent that no selection produced by you

hereunder is or shall be subject to any restrictions pursuant to any other agreement to which you are or have been party or by which you are otherwise bound.

(b)   During the term of this contract you shall become and remain a member in good standing of any appropriate labor union or unions with which we may at any time have an agreement lawfully requiring such union membership.

(c)   The Masters shall be recorded in accordance with the rules and regulations of all labor unions having jurisdiction over the recording thereof.

(d)   No Producer's Controlled Compositions nor any other selections, materials, ideas, or other properties furnished or selected by you including, but not limited to so-called "samples" and embodied or contained in or used in connection with the Masters or the packaging or advertising for phonograph records hereunder will violate or infringe upon any common law or statutory right of any person, firm or corporation, including, without limitation, contractual rights, copyrights, and rights of privacy.  You also warrant and represent that no selection produced hereunder shall infringe upon the rights or copyrights of any third party and that you shall not incorporate any sampled and/or recreated musical/vocal material owned by a third party without the consent of the owner of such sampled and/or recreated musical/vocal material, which consent you shall secure at your own expense.  In the event we are required to pay for any costs in connection with such sampled and/or recreated musical/vocal material, whether in the form of clearance fees, sample service company fees, royalties, advances, legal fees, musicologist fees, cost and expenses of lawsuits, or judgments, such costs shall be deducted from any monies payable to you hereunder.

11.   We shall have the right, at our election, to designate other producers for recording sessions with the Artists, in which event you shall have no rights hereunder with respect to the master recordings produced at such recording sessions.  During the term hereof and for five (5) years

thereafter you shall not produce for any person, firm or corporation other than us a master recording embodying any selection recorded hereunder.

      12.  (a)  You hereby irrevocably and absolutely assigns, conveys and sets forth over to us (or our publishing designee) an undivided ninety-nine percent (99%) interest in the worldwide copyright (and all renewals and extensions thereof) and all other rights in and to the extent of your original interest in any musical composition written by you, in whole or in part, or owned and controlled by you, in whole or in part, during the Term of this Agreement including, but not limited to, the copyright in and to the musical compositions embodied in the Masters (collectively the "Compositions").  Attached hereto as Exhibit "A" is an Assignment of Copyright.

      (b)  We shall be the exclusive administrator of all rights in and to throughout the world and it shall be entitled to exercise any and all rights with respect to the control, exploitation and administration of the Compositions including, without limitation, the sole right to grant licenses, collect all income, and to use the name, likeness and biographical material of each composer, lyricist and songwriter hereunder in connection with each composition for the full term of copyright wherein and thereto (including all renewals and extensions thereof).

      (c)  You represent and warrant that:  (i) the Compositions are, and shall be, original and shall not infringe upon or violate the rights of any other person; and (ii) You shall have the full and unencumbered right, power and authority to grant to us all of the rights herein granted.  You hereby agree to indemnify us from and against any loss, damage, expense or liability (including actual legal costs and attorneys' fees) in respect of any claims, demands, liens or encumbrances.

      (d)  From all royalties earned and received by us in the United States from the exploitation of the Compositions throughout the world (the "Gross Receipts"), we shall:  (i) deduct and retain all out-of-pocket costs incurred by us in connection with the exploitation, administration and protection of the Compositions; (ii) deduct and pay any actual third party

administration fees; and (iii) deduct and pay royalties payable
to you as the writer of the Compositions (which you warrant and
represent shall not exceed ninety-nine percent (99%) of the
Gross Receipts); in addition, the royalties payable to the
writers of the Compositions pursuant to this subparagraph shall
not include any of the so-called "writer's share" of any public
performance income received by Company from any performing
rights society which directly pays writers, authors or composers
the writer's share of such income unless received by us in which
case the writer's share will be promptly paid without deduction
or offset; and (iv) pay to you an amount equal to ninety-nine
percent (99%) of the sum remaining after deducting the aggregate
sum set forth in subparagraphs (i), (ii) and (iii) above, and
the remaining one percent (1%) thereof shall be retained by us
for our own use and benefit. Notwithstanding the forgoing, while
Artist is entitled to 1% of the publishing royalties hereunder,
Artist hereby waives Artist's percentage of the publishing
royalties and shall not receive any portion of the publishing
royalties hereunder.

        (e)   Accountings for such royalties shall be
rendered semi-annually.

        (f)   You shall execute and deliver to us any and
all documents (including, without limitation, assignments of
copyright) which we may require to vest in us and/or our
designees the copyright and other rights herein granted to us in
respect of each Composition.  If you shall fail to promptly
execute any such document within ten (10) business days after
you receive the applicable documentation, you hereby irrevocably
grant us a separate power of attorney to execute such document
in your name and place.

        (g)   The provisions of this paragraph 12 with
respect to co-publishing shall serve as the complete
understanding between the parties with respect to the subject
matter hereof unless the parties (or their respective publishing
designees) enter into a more formal co-publishing agreement (the
"Formal Co-Publishing Agreement") embodying the provisions
hereof and such other provisions as shall be negotiated in good

faith and accordance with industry standards.   The parties agree that if they do not enter into such Formal Co-Publishing Agreement, the provisions of this Paragraph 12 shall remain in full force and effect.

13.   You expressly acknowledge that your services hereunder are of a special, unique, and intellectual character which gives them peculiar value, and that in the event of a breach by you of any term, condition, or covenant hereof, we will be caused irreparable injury.   You expressly agree that in the event you shall breach any provision of this contract, we shall be entitled to elect any and all remedies provided in such event by law or equity, in addition to any other rights or remedies available to us, and we shall have the right to recoup any damages incurred by us as a result of such breach from any monies which may be payable to you hereunder.

14.   You hereby agree to and do hereby indemnify, save, and hold us harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorneys' fees) arising out of or connected with any claim, demand, or action which is inconsistent with any of the warranties, representations, or covenants made by you in this contract.   You agree to reimburse us, on demand, for any payment made by us at any time with respect to any such damage, liability, cost, loss or expense to which the foregoing indemnity applies.   We shall notify you of any such claim, demand, or action promptly after we have been formally advised thereof.   Pending the determination of any such claim, demand, or action, we shall have the right, at our election, to withhold payment of any monies otherwise payable to you hereunder.

15.   (a)   We shall have the right, at our election, to suspend the running of the term of this contract and our obligations hereunder upon written notice to you if for any reason whatsoever your ability to perform as a producer shall become impaired or if you shall refuse, neglect, or be unable to comply with any of your obligations hereunder, or if as a result of an act of God, accident, fire, labor controversy, riot, civil commotion, act of public enemy, law, enactment, rule, order, or act of any government or governmental instrumentality, failure

of technical facilities failure or delay of transportation
facilities, illness or incapacity, or other cause of a similar
or dissimilar nature not reasonably within our control or which
we could not by reasonable diligence have avoided, we are
hampered in the recording, manufacture, distribution, or sale of
phonograph records or our normal business operations become
commercial impractical.  Such suspension shall be for the
duration of any such event or contingency, and, unless we notify
you to the contrary in writing, the term hereof shall be
automatically extended by such number of days as equal the total
number of days of any such suspension.

(b)  In the event your ability to perform as a
producer shall become impaired or if you shall refuse, neglect,
or be unable to comply with any of your obligations hereunder,
then we shall have the right, at our election, in addition to
any other rights or remedies which we may have in such event, to
terminate this contract upon written notice to you and shall
thereby be relieved of any and all obligations hereunder except
our obligations with respect to Masters produced by you
hereunder prior to such termination.

16.  We shall have the right, at our election, to
assign this Producer's Agreement and/or any of our rights
hereunder, in whole or in part, and to the extent of such
assignment, we shall thereafter be relieved of our obligation.
You shall not have the right to assign any of your rights
hereunder.

17.  All notices to be given to you hereunder and all
statements and payments to be sent to you hereunder shall be
addressed to you at the address set forth on page 1 hereof or at
such other address as you shall designate in writing from time
to time.  All notices to be given to us hereunder shall be
addressed to us at the address set forth on page 1 hereof or at
such other address as we shall designate in writing from time to
time.  A courtesy copy of all notices to be given to us shall be
sent to The Pina Firm, LLC, Attn: Stephen A. Pina, Esq., 444 N.
3rd Street, Suite 110, Philadelphia, PA 19123.  All notices shall
be in writing and shall either be served by personal delivery
(to an officer of our company if to us), certified mail, return

receipt requested or overnight delivery, with proof of receipt, all charges prepaid.  Except as otherwise provided herein, such notices shall be deemed given when personally delivered, mailed or delivered by overnight courier, all charges prepaid, except that notices of change of address shall be effective only after the actual receipt thereof.

18.  (a)  This contract sets forth the entire understanding of the parties hereto relating to the subject matter hereof.  No modification, amendment, waiver, termination or discharge of this contract or of any of the terms or provisions hereof shall be binding upon either of us unless confirmed by a written instrument signed by you and by a duly authorized officer of our company.

(b)  We shall not be deemed to be in breach of any of our obligations hereunder unless and until you shall have given us specific written notice by certified or registered mail, return receipt requested, of the nature of such breach and we shall have failed to cure such breach within a reasonable time after our receipt of such written notice.

19.  You acknowledge that Stephen A. Pina, Esq. represents us and that you have been advised and have had an opportunity to have the terms of this Agreement reviewed and explained to you by independent counsel of your choosing.

20.  You agree to be available at all times at any place or places we may designate from time to time unless excused in writing by us, it being expressly agreed that your services shall be rendered in any country to such extent as may be required by us.

21.  This Agreement shall be governed by the laws of the State of New Jersey and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with and governed by the laws of the State of New Jersey.

If the foregoing correctly reflects your understanding and agreement with us, please do indicate by signing below.

Very truly yours,

IN THE STRUGGLE PRODUCTIONS LLC

By: _____

**Jose Trespalacios**


AGREED AND ACCEPTED:

By: _____

**Ruben D. Sosa Jr.**

Social Security #: ███████████

-17-

EXHIBIT "A"

ASSIGNMENT OF COPYRIGHT

For and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby irrevocably sells, assigns, transfers, sets over and conveys to In The Struggle Productions, LLC, its assignees, designees, successors and assigns (subject to the terms of that certain agreement between In The Struggle Productions, LLC and _____ of even date herewith) (the "Agreement"), ninety-nine percent (99%) of the undersigned's undivided right, title and interest in the entire worldwide copyright and all other rights, including any renewals, extensions and reversions of copyright including the right to administer the Compositions and all other rights in and to all Compositions written by _____ as described in the Agreement, including the title, music and lyrics thereof.

IN WITNESS THEREOF, the undersigned has caused this transfer of copyright to be executed this ___ day of _____, 2009.

By: _____
    Ruben D. Sosa Jr.

ACKNOWLEDGEMENT

STATE OF _New Jersey_          :
                                : SS
COUNTY OF _Hudson_             :

On this _19th_ day of _January_____, 2012, before me personally came _Ruben D. Sosa Je._, known to me to be the person named in and who executed the foregoing agreement, and who has acknowledged to me that he/she has executed same.

_____
Notary Public

JAMEELAH B. HARDIN
ID # 2398725
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 7/28/2015

-18-

## RECORDING AGREEMENT

**THIS RECORDING AGREEMENT** (this "Agreement") is entered into as of January 19, 2012., between **Ruben D. Sosa, Jr.** p/k/a **"Cito On The Beat"** ("Artist" or "You"), whose address is ███████████████████████████ and **In The Struggle Productions, LLC.**, ("Company") whose address is ██████████████████████

### 1.  Services.

(a)  During the Term (as defined in Section 2(e) below), you will, in accordance with this Agreement, (i) render exclusively to Company your services as a musical recording artist for the purpose of making Masters for Company (ii) regularly disclose to Company the musical compositions and recordings you create and (iii) Deliver the Masters to Company. You will perform such related services as Company may require, including performing in videos, making live appearances and participating in other customary activities in connection with the marketing and promotion of Phonorecords and videos derived from Masters hereunder.

(b)  "Master" means every form of recording, whether now known or unknown, embodying sound or sound accompanied by visual images embodying Artist's performances of a musical composition which has not previously been recorded (by Artist or others), it being understood that multiple versions (e.g., different mixes or edits) of the same musical composition or the same recording will be deemed to be the same Master for all purposes hereunder. "Phonorecord" has the meaning given to such term under the U.S. Copyright Act, 17 U.S.C. Sec. 101 *et seq.*, or any successor statute thereto, as in effect from time to time. "Samples" means any copyrighted or otherwise proprietary recordings, musical selections or other materials belonging to anyone other than Artist or Company which are embodied or otherwise incorporated in any Masters that are subject to this Agreement (including the Demos referenced in Section 2(a) below).

(c)  "Delivery" or words of similar connotation used in connection with any Masters for any Album (as defined in Section 2(c) below) or other Phonorecord hereunder means the delivery by Artist to Company of: (i) fully-mixed, leadered, sequenced, equalized and unequalized master tapes (including final two-track equalized tape copies) in proper form for the production of the parts necessary to manufacture Phonorecords therefrom, which Masters have been approved by Company as commercially and technically satisfactory for the manufacture and sale of Phonorecords; (ii) all consents, approvals, permissions, clearances (including for Samples), mechanical licenses, label and copy information, credits, and other materials and documents required by Company to release Phonorecords embodying those Masters and to manufacture record covers and other packaging therefore, and (iii) all copies, reproductions and derivatives, of every form and kind, of all of the Masters related to the Album or other Phonorecord in question.

2.      **Term; Recording Commitment.**

(a)      The initial contract period of the Term will commence on the date first written above and continue until the twenty-four (24) month anniversary of the date as of which you have made complete Delivery to Company of demonstration recordings (the "Demos") of at least six (4) musical compositions (or such fewer number as Company deems sufficient) selected or approved by Company which embody your performances (but in no case less than thirty six (36) months after the date hereof), except that: (i) if a Distribution Agreement has been executed as of the end of the initial contract period, then the Term will extend as provided under the succeeding provisions of this Section 2; or (ii) if Company is engaged in substantive negotiations concerning a Distribution Agreement at the time the initial contract period would otherwise expire, then the initial contract period will automatically extend until Company has executed that Distribution Agreement or terminated those negotiations (but such extension will not exceed one hundred-twenty (120) days). The Demos will be in a form acceptable to Company and sufficient, in its judgment, to use for the solicitation of an offer from a Record Company to enter into an agreement with Company for the distribution of Phonorecords and videos to be recorded by you (a "Distribution Agreement"). "Record Company" means any record company or label whose records are distributed in the United States.

(1)      If a Distribution Agreement is obtained: (i) Artist's exclusive personal services as a recording artist will be rendered to Company; (ii) Company will furnish such services and the resulting Masters to the Record Company; and (iii) the Record Company will manufacture and distribute Phonorecords embodying Artist's performances.

(2)      Company shall have the exclusive right to negotiate and agree to all terms and conditions of the Distribution Agreement.

(b)      If a Distribution Agreement is entered into during the Term (as same may be extended pursuant to subparagraph 2(a) above, then except as provided in Paragraph 2 (c) below, the Term of this Agreement shall be co-terminous with the Term of the Distribution Agreement, with the Term of this Agreement being comprised of contract periods equal in number and length to the contract periods in the Distribution Agreement. Each such option shall be automatically exercised by Company unless Company gives written notice to Artist that Company is terminating this Agreement.

(c)      Notwithstanding anything to the contrary contained in this Agreement, in the event that the term of the Distribution Agreement expires or is terminated, then Company shall have a period of twelve (12) months from and after such date of expiration or termination (the " Shopping Period") within which to enter into a new distribution agreement (the "New Distribution Agreement") with a new record company or distributor to furnish Artist's exclusive services as a recording artist. In the event that Company enters into a New Distribution Agreement, then the Term of this Agreement shall be extended and shall be co-terminous and co-extensive with the term of such New Distribution Agreement, and all other applicable terms of this Agreement shall apply accordingly.

(d)     If Company fails to enter into a Distribution Agreement as provided under Section 2(a) above, then this Agreement will automatically terminate without any liability on the part of either party hereto to the other party.

3.     **Recording Costs:  Advances.**

(a)     (1)     As between Company and you, Company will be responsible to pay all direct costs incurred in the production of the Demos and/or Masters hereunder through the end of the mastering process in each configuration (including the production of parts necessary to manufacture Phonorecords), including (i) all sums paid to musicians, producers and other persons rendering services in connection with such Demos and/or Masters, (ii) all costs of obtaining rights to the use of any Samples, (iii) all payments for editing, mastering, mixing, remixing and other similar functions, (iv) required union compensation, and (v) all other costs and expenses incurred hereunder which are now or hereafter generally recognized as recording and mastering costs in the phonograph record industry (collectively, "Recording Costs"). Notwithstanding the foregoing, the costs of mastering and of producing parts necessary to manufacture Phonorecords will not he recoupable from any royalties or other monies otherwise payable to you hereunder; unless (and then only to the extent that) any of such costs are chargeable against Company's account under the Distribution Agreement.

(2)     Company shall be entitled to repayment of: (i) all bona fide costs incurred or paid by it in connection with the production of the Existing Compositions, (ii) all bona fide costs incurred or paid by it in connection with the development of Artist's musical abilities and professional image, (iii) all bona fide costs incurred or paid by it, including, without limitation, providing Artist with air transportation, ground transportation, hotel accommodations and per diems in connection with the production of the Existing Compositions and in connection with Artist's meetings with record companies in order to secure a Distribution Agreement, (iv) the providing to record companies of promotional items related to Artist (v) all additional monies (if any) that Company, during the period after the date hereof and prior to Company's receipt of the initial funds provided by the Distributor, may pay, at Artist's request, to or on behalf of Artist in the nature of advances. Such repayment shall be made "off the top" of any and all monies of any kind (including, but not limited to, the initial recording advance or recording fund obtained by Company under the Distribution Agreement) which are received by Company in respect of its furnishings of Artist's services.

(a) Artist's share of any net advance, which is inclusive of any per diems paid to Artist (i.e., gross advance less any and all costs, including, without limitation, recording costs, line producer advances and fees (including to Company or anyone engaged by, affiliated with or employed by Company), advances or bonuses recoupable solely from Company's share of royalties, advances or payments to third parties, Demo costs, mixing/remixing advances and fees, legal fees incurred in connection with "sample" clearances and on behalf of Company in connection with the Distribution Agreement, direct expenses incurred by the Distributor or Company for independent publicity and for the independent promotion and marketing of Artist's recordings and costs for the production of videos), that are paid to Company under the

Distribution Agreement shall be split on the following basis: 1% to Artist/99% to Company. Notwithstanding the foregoing: (a) any advance payable pursuant to the Distribution Agreement prior to the delivery of the first album shall be deemed an advance in connection with the Masters to be embodied on the first album and (b) Artist's share of an advance will not be payable until the applicable Masters are satisfactorily delivered to Distributor, unless Company receives a non-producer fee, "signing advance" before delivery of the applicable Masters, in which case Artist will receive Artist's 1% share promptly after Company is paid. Notwithstanding anything contained herein, Artist is not entitled to any monies payable to Company for overhead or in connection with a multi-artist deal where such advance monies are not specifically and solely attributable to Artist. Further, notwithstanding the forgoing, while Artist is entitled to 1% of the net advance hereunder, Artist hereby waives Artist's percentage of the net advance and shall not receive any portion of the net advance hereunder.

(b)     An "Advance" means a prepayment of royalties (whether or not designated as such herein or at the time of payment). All costs, expenses and liabilities paid to Artist by (or for the account of) Company, or paid or incurred on Artist's behalf by (or for the account of) Company, pursuant to this Agreement or the Distribution Agreement will constitute Advances; except for royalties paid pursuant to Section 5(a) below and music publishing income paid pursuant to Section 7 below. Without limiting the generality of the foregoing, Advances include: (i) all Album Advances and Recording Costs; (ii) all packaging expenses in excess of the Record Company's then-standard design, engraving or manufacturing costs with respect to a standard record package; (iii) all expenses related to the production of, or the acquisition of rights in, any videos made hereunder; and (iv) all expenses incurred in connection with independent marketing or independent promotion of Phonorecords or videos featuring Artist's performances (i.e., promotion by anyone other than regular employees of Company or the Record Company); provided that, with respect to the expenses referenced in the foregoing clauses (ii) through (iv), none of them will be recoupable from your royalties hereunder except to the extent that they are recoupable by the Record Company under the Distribution Agreement

(c)     All Advances will be fully recoupable from (i) all royalties payable to or on behalf of Artist pursuant to Section 5 below, (ii) any other monies payable to or on behalf of Artist pursuant to any other agreement to which Artist and Company (or any of its affiliates) may now or hereinafter be party. You understand that, whenever any Advances are being recouped from royalties otherwise payable to or on behalf of you pursuant to Section 5 below, they shall be recouped from your royalties as computed at the "net artist rate" (meaning your all-in royalties net of all royalties payable to producers and other persons granting rights or rendering services, or deriving royalty participation rights through you, in connection with Masters made hereunder).

(d)     Each Album Advance includes all union scale payments that may be due to you, under applicable union regulations, in connection with the Album in question. Company will not be obligated to make any separate payment thereof. In the event that you render any production, mixing or similar services in connection with any Master hereunder, you will not be entitled to any additional compensation hereunder.

4.    **Creative Elements**.   Company will consult with you regarding all of the creative elements relating to the production and recording of Masters hereunder, including (but not limited to) the studios at which such Masters are recorded, the musical compositions to be embodied in such Masters and all persons rendering services or furnishing materials in connection with such Masters; it being agreed that Company's decision with respect to any particular creative element will control. No casual or inadvertent failure to consult with you as provided in this Section 4 will be deemed a breach of this Agreement by Company.

5.    **Royalties; Accountings**.

(a)  In respect of Records (regardless of format or configuration) sold anywhere in the world, Company will pay to you a record royalty in an amount equal to one percent (1%) of all "Net Record Receipts", which term means all royalties, license fees and other monies of any kind and from any source (excluding mechanical royalties paid pursuant to Section 7(a) herein) that Company, pursuant to the Distribution Agreement or otherwise, actually received during the applicable semi-annual accounting period in respect of the sale, license or other commercial exploitation of such phonograph records, less all costs incurred or paid by Company in the collection of such monies. Notwithstanding the forgoing, while Artist is entitled to 1% of the line record royalty hereunder, Artist hereby waives Artist's percentage of the record royalty fee and shall not receive any portion of the line production fee hereunder.

(b)  The royalties payable pursuant to Section 5(a) above are inclusive of all royalties payable (other than mechanical royalties paid pursuant to Section 7(a) herein), in respect of commercial exploitations of Masters made hereunder, to you and fifty percent (50%) of all royalties payable, in respect of commercial exploitations of Masters made hereunder to all producers (including Company's staff producers ("Staff Producers")), musicians, vocalists and other persons granting rights or rendering services (or deriving royalty participation rights through you) in connection with such Masters (but excluding so called "per-record royalties" due to the AFM Special Payments Fund and the Music Performance Trust Fund); it being agreed that the Staff Producer of any Album hereunder will be accorded a basic "retail" royalty of no more than four percent (4%). Company will have the right to make direct payment of any royalties owing to any such third-party royalty participants out of monies otherwise due to you under Section 5(a) above.

(c)  Upon your written request made at any time after the Distribution Agreement's execution, Company will provide you with a customary letter of direction from it to the Record Company providing for direct payment to you of monies payable under Section 5(a) above. If such direct payment and accounting does not occur, then Company will render accountings as to monies accruing to Artist under that Section (i) within sixty (60) days of Company's receipt from the Distribution Company.

6.     **Grant of Rights.**

(a)   You hereby agree that all materials created during the Term of this Agreement and all results and proceeds of your services hereunder, including all Masters made or Delivered during the Term (including outtakes, mixes, remixes and other versions), all artwork (including photographs), all videos and all other materials representing any results or proceeds of your services hereunder (all such materials, results and proceeds being sometimes collectively called the "Materials") will from the inception of creation be forever regarded throughout the world as "works made for hire" for Company. In the event any Materials are not deemed "works made for hire", you hereby grant, assign and license to Company, and agree that Company will be the exclusive owner of, all right, title and interest throughout the world in perpetuity in and to such Materials, including all copyrights therein, all renewals and extensions of such copyrights and all other ownership and exploitation rights therein. The rights granted to Company above in this Section 6(a) are sometimes collectively called the "Rights".

(b)     Without limiting the generality of Section 6(a) above, the Rights include (but are not he limited to) the perpetual, worldwide, unlimited and exclusive rights to do (and to license, sublicense or otherwise authorize or permit others to do) the following: (i) manufacture Phonorecords and videos by all methods now or hereafter known embodying all or any portion of the performances embodied on Masters hereunder, (ii) publicly perform such Phonorecords and videos in any media now or hereafter known; (iii) import, export, sell, distribute, market, transfer, lease or rent, or otherwise deal in, exploit or dispose of, such Masters, Phonorecords and videos in any and all forms (including through such electronic means as computer on-line systems, the Internet, etc.) under any trademarks, trade names or labels designated by Company; (iv) change, edit, add to, take from, dub, mix, remix, adapt, reformat or reprocess such Masters and videos in any manner for any reason (including to conform to technological or commercial requirements in various formats now or hereafter known or developed, and to eliminate material which might subject Company to any legal action in any jurisdiction); (v) use the Masters for background music, synchronization in motion pictures and television soundtracks and other similar purposes, including use in means of transportation and in commercials for any product in any and all media, without any payment other than as provided herein; (vi) record, perform distribute, market and sell copies of the musical compositions embodies in the Masters; and (vii) delay or refrain from doing any or all of the foregoing.

(c)     You hereby grant to Company the rights, throughout the world in perpetuity, to reproduce, print, publish and disseminate (and to license others to reproduce, print, publish and disseminate), in any medium now or hereafter known, the names (including professional names), approved likenesses, other approved identification and approved biographies of Artist and all other persons rendering services and/or granting rights in connection with any of the Materials for purposes of (i) advertising, promotion and trade in connection with the manufacture, sale, marketing, distribution and other exploitation of Phonorecords and videos hereunder and (ii) general goodwill advertising. With respect to Artist, Company's rights under this Section 6(c) will be exclusive during the Term and non-exclusive thereafter.

7.   **Mechanical License**

(a)     Artist shall cause the copyright proprietors to issue to Producer or its licensees mechanical licenses for the United States and Canada for all Compositions embodied in Master Recordings made hereunder which are not Controlled Compositions (as hereinafter defined) at rates and upon terms no less favorable to Producer than those contained in the then current standard mechanical license issued by The Harry Fox Agency, Inc.

(b)     As used in this Agreement, the term "Controlled Composition" means a Composition embodied in a Master Recording recorded hereunder, which Composition (i) is written or composed, in whole or in part, by Artist or a producer of such Master Recording, or (ii) is owned or controlled in whole or in part, directly or indirectly, by Artist and/or a producer or by any person in which Artist and/or a producer have a direct or indirect interest. Company and its licensees are hereby granted a mechanical license for all "Controlled Compositions" for the United States and Canada at a rate per Composition equal to 3/4 of the minimum statutory rate (without regard to any playing time formula) in effect in the country concerned on the delivery date of the Master Recording embodying the applicable Controlled Composition (the "Applicable Statutory Rate"), on the basis of Net Sales of Records, except that no copyright royalties shall be payable with respect to (i) any Records as to which no royalties are payable pursuant to Paragraph 6 hereof and (ii) arranged versions of Compositions in the public domain which are claimed by Artist to be Controlled Compositions. The copyright royalty rate for Controlled Compositions contained on Records sold other than through Normal Retail Channels in the United States of America shall be three-fourths (3/4) of the foregoing rate. The license granted in this subparagraph includes the right, without additional compensation, to record, reproduce, perform and broadcast the Controlled Compositions in synchronization with audio-visual reproductions (e.g., motion pictures and audiovisual devices) of Artist's performances.

(c)     Notwithstanding the provisions of Paragraph 18(b) hereof, with respect to records sold in the United States or Canada, the maximum aggregate copyright royalty rate payable by Company or its Licensees in respect of any Album hereunder, regardless of the number of Compositions and regardless of playing time, shall be ten times 75% of the Applicable Statutory Rate at the time of commencement of recording of a Master, and the maximum aggregate copyright royalty rate payable by Company in respect of any Single Record or other Record, regardless of the number of Compositions or playing time will be two times 75% of the Applicable Statutory Rate at the time of commencement of recording of a Master. Accordingly, in the event the actual aggregate copyright royalty rate which Company or its licensees are required to pay in respect of any Album or any Single Record hereunder shall exceed the applicable maximum aggregate copyright royalty rate listed above, then Company or its licensees shall have the right to deduct such excess from the aggregate copyright royalty rate for the Controlled Compositions, if any, contained thereon; to the extent Company is unable to recover all of such excess from the aggregate copyright royalty rate for the Controlled Compositions, if any, contained thereon, Company shall have the right to deduct the additional payments required to be made by Company from any royalties or other sums payable to you under this Agreement. For the purposes of computing mechanical royalties, different versions of the same Composition will not be considered more than one Composition.

(d)     Any assignment made of the ownership or copyrights in, or the rights to license or administer the use of, any Controlled Compositions shall be subject to the terms and provisions hereof.

(e)     Notwithstanding anything contained herein, in the event Company enters into a Distribution Agreement, the provisions of the Distribution Agreement that apply to Artist regarding mechanical royalties shall control in those cases where they are different from this Agreement.

## 8.   CO-PUBLISHING AND ADMINISTRATION AGREEMENT

(a)     Pursuant to the Assignment of Copyright attached hereto as Exhibit "B" and made a part hereof, Artist hereby irrevocably and absolutely assigns, conveys and sets forth over to Company (or its publishing designee) an undivided one hundred percent (100%) interest in the worldwide copyright (and all renewals and extensions thereof) and all other rights in and to the extent of Artist's original interest in any musical composition written by Artist, in whole or in part, or owned and controlled by Artist, in whole or in part, during the Term of this Agreement including, but not limited to, the copyright in and to the musical compositions embodied in the Demos and the Masters (the "Compositions").

(b)     Company shall be the exclusive administrator of all rights in and to the Compositions throughout the world and it shall be entitled to exercise any and all rights with respect to the control, exploitation and administration of the Compositions including, without limitation, the sole right to grant licenses, collect all income, and to use the name, likeness and biographical material of each composer, lyricist and songwriter hereunder in connection with each Composition for the full term of copyright therein and thereto (including all renewals and extensions thereof).

(c)     Artist represents and warrants that: (i) the Compositions are, and shall be, original and shall not infringe upon or violate the rights of any other person; and (ii) Artist shall have the full and unencumbered right, power and authority to grant to Company all of the rights herein granted. Artist hereby agrees to indemnify Company from and against any loss, damage, expense or liability (including actual legal costs and reasonable attorneys' fees) in respect of any claims, demands, liens or encumbrances in connection with the Compositions.

(d)     From all royalties earned and received by Company in the United States from the exploitation of the Compositions throughout the world (the "Gross Receipts"), Company shall:  (i) deduct and retain all out-of-pocket costs incurred by Company in connection with the exploitation, administration and protection of the Compositions; (ii) deduct and pay any actual third party administration fees; (iii) deduct and pay royalties payable to the writers of the Compositions covered by this Agreement; (iv) deduct and pay any recording costs or other advances expended hereunder or under the Distribution Agreement; and (v) pay to Artist an amount equal to zero percent (0%) of the sum remaining after deducting the aggregate sum set forth in subparagraphs (i), (ii), (iii) and (iv) above, and the remaining one hundred percent (100%) thereof shall be retained by Company for its own use and benefit. In addition, the royalties payable to the writers of the Compositions pursuant to this subparagraph shall not include any of the so-called "writer's share" of any public performance income received by Company from any performing rights society which directly pays writers, authors or composers the writer's share of such income unless received by Company in which case the writer's share will be promptly paid without deduction or offset.

(e)     Accountings for such royalties shall be rendered semi-annually and shall be governed by Paragraph 8 hereof.

(f)     Company shall pay to Artist 1% of the advances paid solely in connection with the Compositions, if any, payable to Company by any third party administrator, provided that Company shall not be obligated to pay such advance to Artist if Company includes Artist's Compositions as part of a deal including compositions written by writers other than Artist. All such advances shall be recoupable against royalties payable to Artist hereunder. Notwithstanding the forgoing, while Artist is entitled to 1% of the advances paid hereunder, Artist hereby waives Artist's percentage of the advances paid and shall not receive any portion of the advances paid hereunder.

(g)     Artist shall execute and deliver to Company any and all documents (including, without limitation, assignments of copyright) which Company may require to vest in Company and/or its designees the copyright and other rights herein granted to Company in respect of each Composition.  If Artist shall fail to promptly execute any such document within ten (10) days after Artist receives the applicable documentation, Artist hereby irrevocably grants Company a separate power of attorney to execute such document in Artist's name and place.

(h)     The provisions of this paragraph 17 with respect to co-publishing shall serve as the complete understanding between the parties with respect to the subject matter hereof unless the parties (or their respective publishing designees) enter into a more formal co-publishing agreement (the "Formal Co-Publishing Agreement") embodying the provisions hereof and such other provisions as shall be negotiated in good faith and accordance with industry standards.  The parties agree that if they do not enter into such Formal Co-Publishing Agreement, the provisions of this Paragraph 17 shall remain in full force and effect.

9. **Merchandising**.

      (a)    Artist hereby grant to Company, throughout the world in perpetuity, the rights to use and reproduce Artist's names, professional names, logos or trademarks, biographical information, portraits or other likenesses for any commercial, advertising or merchandising pm-pose (such rights, the "Merchandising Rights"). Company's rights under this Section 8 will be exclusive during the Term and non-exclusive thereafter. Company shall have the right, but not the obligation, to file for and obtain trademark protection for Artist's names, professional names, logos and trademarks. Artist hereby consents to such filings and registrations and should this consent be deemed insufficient or upon request, Artist will execute documents necessary and cooperate fully to procure trademark protection.

      (b)    Company shall, on not less than a semi-annual basis and assuming that Company is then in a fully recouped position, pay to Artist within sixty (60) days after receipt by Company a sum equal to zero percent (0%) of all Net Merchandising Receipts. The term "Net Merchandising Receipts" means all monies actually received by Company during such accounting period which relate to the exercise or exploitation of any Merchandising Rights, less all Company's related expenses and collection costs, all related commissions and royalties payable by it to any third parties, all related manufacturing, design, packaging, shipping, storing, postage and insurance costs incurred by it, and the reasonable costs of advertising and promoting the merchandise.

    **9A.**    **Revenue Share.**

      (a)    During the Term of this Agreement, Artist shall irrevocably assign to Company, as and when received by, or otherwise credited, to Artist, a sum equivalent to One hundred (100%) percent of Artist's Gross Compensation resulting from Artist's activities in the Entertainment Industry (the "Revenue Share"). Gross Compensation specifically excludes any Gross Compensation paid to Artist by Company.

      (b)    Artist shall account the Revenue Share to Company as and when Artist is paid, or credited with, Gross Compensation during the Term of this Agreement pursuant to (i) any and all contracts, engagements and commitments entered into or negotiated during the Term hereof; including, any and all extensions, additions, substitutions, renewals, replacements, modifications and amendments of all such contracts, engagements and commitments; and, (ii) any and all judgments awards, settlements, payments, damages (less professional fees and costs incurred by Artist) and proceeds relating to any suits, claims, actions, proceedings or arbitration proceedings arising out of alleged breach, non-performance or infringement by others of any of the contracts, engagements, commitments, other agreements or rights referred to in subparagraph (i), above.

(c).     Artist will pay the Revenue Share to Company within five (5) days after Artist's receipt of Gross Compensation. Artist grants Company a lien on any Gross Compensation in an amount equal to the Revenue Share.  The assignment to Company of the Revenue Share is intended to create an agency coupled with an interest.

(d)     The term "Entertainment Industry" shall include any and all branches of such fields now existing or hereafter developed, conceived, or used, including, but without limiting the generality of the foregoing, the following: motion pictures, free and pay television, home video, theatrical  engagements, legitimate stage, personal appearances, concerts, public appearances in places of amusement and entertainment, video games and devices, record production, music and literary publishing and songwriting, radio, and the use and licensing of Artist's name, likeness and/or talent for purposes of merchandising, commercial exploitation, advertising and/or trade.  Entertainment Industry shall not include Artist's Website or Artist's activities as a recording artist, and any contracts artist may enter into with respect to Artist's recording services with any person, firm or corporation, including Company.

(e)     The term "Gross Compensation"  shall include all forms of income derived from Artist's professional career in the Entertainment Industry, without deductions, except as may otherwise be provided herein, including, but without limiting the foregoing, the total compensation, salaries, earnings, fees, royalties, advances, residuals, repeats and/or re-run fees, bonuses and the total amount paid for any endorsements, or any entertainment package or package program, live or recorded, earned and received, directly by Artist, or Artist's heirs, executors, administrators or assigns, or any other person, firm or corporation in my behalf, or in which Artist has an interest of any kind.

(f)     The terms "engagements", "contracts", "agreements", and "employment" shall include any and all engagements, contracts, agreements or employment of any kind whatsoever entered into during the term hereof, or substantially negotiated during the term hereof, which relate in any way to Artist's activities in the Entertainment Industry.

(g)     Company may conduct audits to verify the accuracy of Artist's books and records in respect of Gross Compensation and Artist's accountings to Company. Any audit you conduct will be at my usual place of business or wherever Artist's books and records are kept, and during usual business hours.

(h)     Notwithstanding anything to the contrary, Company agrees that it shall not begin receiving the revenue discussed in this paragraph 8 (A) until the first occurrence of either the commercial release of a single or the commercial release of Album 1.

10.     **Videos.**

(a)     If Company in its discretion elects to produce a video in connection with any Masters that you Deliver to Company hereunder, then with respect to each such video (i) you will render such services as Company will reasonably require, and (ii) if it embodies a "controlled composition" (as that term will be defined in the Distribution Agreement), then you

hereby grant to Company worldwide, irrevocable and perpetual synchronization and public performance licenses at no cost for the use and exploitation of such controlled composition in the video. Company and its licensees and designees will not be required to deliver any payment or other consideration (whether to you, anyone else having an interest in the composition in question, or otherwise) in connection with those synchronization and public performance licenses; and those licenses will apply whether or not Company receives any payment or other consideration in connection with any use or exploitation of any such video. If any exhibition of any such video is also authorized under an-other license (such as a public performance license grained by ASCAP or BMI), then (A) that exhibition will be deemed authorized under that license instead of this Agreement, and (B) Company and its licensees and designees will in no event have any liability by reason of any such exhibition.

(b)     Company will consult with you regarding the date, location, Company, director and concept (or script) of each such video; provided that (i) Company's decision with respect to any such element will control, and (ii) no casual or inadvertent failure to consult as provided in this paragraph (b) will be deemed a breach of this Agreement by Company.

(c)     In respect of videos (regardless of format or configuration) sold anywhere in the world, Company shall be obligated to pay Artist a royalty in an amount equal to zero percent (0%) of all "Net Video Receipts", which term means the gross monies actually received by Company during the applicable semi-annual accounting period from the sale or other commercial exploitation of the videos less any amount which Company pays in connection with the exploitation of the videos, including payments to Company's, publishers, labor organizations, shipping and duplication costs, and distribution fees (it being agreed that Artist's share of the Net Video Receipts shall be inclusive of any compensation for the use in the videos of any of Artist's controlled compositions).

11.     **Representations; Indemnification.**

(a)     You hereby represent, warrant and agree that: (i) you have the full right, power and authority to enter into and perform this Agreement and to grant the rights granted (or purported to be granted) hereunder without any restrictions or limitations whatsoever; (ii) Company will not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of rights pursuant to this Agreement except as specifically provided herein; (iii) all Masters hereunder have been or will be produced under and in conformity with all union agreements to which the Masters hereunder may at any time be or become subject; (iv) neither the Materials nor the rights granted hereunder (including the right to use Artist's professional name) nor any authorized exploitation, use or exercise thereof by Company or designees will violate or infringe any copyright, trademark, right of privacy or publicity, or other right of any person or will be subject to any claims, liens or other encumbrances of any person; (v) there are no unreleased Masters embodying your performance which were recorded before the date hereof and produced by anyone other than a Staff Company; (vi) during the Term, you will not, other than for Company and its designees,

authorize or permit your performance to be recorded, or render any services as a performing artist, for the purpose of making, promoting or marketing Masters, Phonorecords, videos or other audiovisual recordings (provided that you shall be permitted to render your performances as a sideman and the like upon such terms as shall be permitted under the Distribution Agreement); (vii) during the period of five (5) years after the first date of Delivery to Company of any Master embodying a particular musical composition (the "Subject Composition") or the period of two (2) years after the Term's expiration (whichever period is longer), you will not (A) authorize or permit anyone, other than Company and its designees, to record, produce, manufacture, sell, distribute or otherwise exploit (by any means now or hereafter known) any Master (or any Phonorecords, videos or other recordings derived therefrom) which contains, embodies or otherwise incorporates (in whole or part, including by way of any Sample) any portion of that Subject Composition or (B) render your services as a recording artist (whether in a featured, solo, step-out, sideman or other capacity) or Company of sound recordings in connection with any of the activities prohibited by the immediately preceding clause (A); and (viii) before the date hereof, Artist has reached the age of majority.

(b)     You will forever indemnify and hold harmless the following persons and entities from and against the Indemnified Claims: (i) Company, its predecessors in interest (if any), and its successors, assigns, administrators, distributors and licensees; (ii) each of the past, present and future subsidiaries and other affiliates of any person or entity referenced in the preceding clause (i); and (iii) each past, present and future director, officer, employee, member, partner, shareholder, owner, agent, attorney, accountant or representative of any person or entity referenced in the preceding clause (i) or (ii). The term "Indemnified Claims" means all claims, demands, complaints, disputes, liabilities, obligations, agreements, actions, causes of action, suits, proceedings, damages, losses, charges, costs, penalties, assessments, debts and expenses of whatever nature (including investigative and legal expenses and reasonable attorneys' fees) which may at any time arise out of or in connection with any violation or breach of any of your representations, warranties and agreements hereunder. You agree to reimburse Company, on demand, for any payment made by Company at any time after the date hereof with respect to any Indemnified Claim. Pending the determination of any such claim, Company may withhold payment of royalties or other monies hereunder in an amount reasonably related to such claim (including anticipated attorneys' fees and costs).

(c)     Your representations, warranties, indemnity obligations and other agreements under this Section 9 will survive any termination, expiration or other cancellation of this Agreement.

12.     **Audit Rights and Related Remedies.**

(a)     At Artist's expense and upon at least thirty (30) days prior written notice to Company, Artist may appoint a certified public accountant (a "CPA") to examine such portions of Company's books and records that pertain to monies accruing to Artist hereunder, but not if such CPA (or his firm) has begun an examination of Company's books and records for

anyone other than Artist (unless that examination has been concluded and any applicable and it issues have been fully resolved). Any such examination may be conducted: (i) only during regular business hours and at the place such books and records are normally kept; (ii) only once per calendar year and once for any accounting statement; and (iii) in respect of any such statement, only within two (2) years after the date it was rendered. If an examination has not been completed within forty-five (45) days after the time begun, then Company may require the CPA to terminate it upon seven (7) days written notice given to Artist at any time, and Company will not be required to permit the CPA to continue such examination after that 7-day period. Artist acknowledges that Company's books and records contain confidential trade information. Except pursuant to an order of a court of competent jurisdiction, neither Artist nor its representatives (including the CPA) will at any time communicate to, or use on behalf of, any other person or entity any information obtained as a result of an examination of Company's books and records.

(b)     Artist will be deemed to have approved and consented to any accounting statement, and such statement will conclusively bind Artist and not be subject to any objection thereby for any reason, unless Artist gives specific written objection, stating the basis thereof within two (2) years from the date such statement was rendered. After the passage of two and one-half (2-1/2) years from such date, Artist will have no right to file or otherwise commence any lawsuit or other judicial proceeding against Company in connection with any accounting statement or payments allegedly owed in respect of the corresponding period. The two year and two and one-half year periods referenced in this paragraph (b) and in paragraph (a) immediately above will be automatically lengthened or shortened as required in order to conform such time periods to those granted to Company under the Distribution Agreement.

(c)     The recovery of monies due hereunder will be the sole remedy available to Artist by reason of any action or claim related to Company's accountings, statements or payments. Without limiting the generality of the preceding sentence, no such action or claim (whatever its basis or resolution) will entitle Artist to: (i) remove any punitive, exemplary, special, consequential or incidental damages; (ii) seek termination of this Agreement or the Distribution Agreement; or (iii) avoid the performance of any of Artist's obligations hereunder or thereunder.

(d)     In no event will Artist have the right to examine or audit the Record Company's books or records. Any royalty statement rendered by the Record Company to Company will conclusively bind Artist unless Company and the Record Company agree to corrections with respect thereto. If an audit by Company of the Record Company's books and records results in the Record Company paying Company additional monies specifically in respect of Masters, Phonorecords or videos made hereunder, then Artist will receive from Company the applicable Artist's share of the net additional monies so paid, after Company deducts "off the top" all expenses of obtaining such recovery (e.g., attorneys' and accountants' fees).

13. **Nature of Artist's Services.**

Artist agrees that: (i) Artist's services hereunder, as well as all Masters hereunder and all rights granted to Company herein, are of a special, unique, extraordinary and intellectual character, giving them a peculiar value the loss of which (A) cannot be readily estimated, or adequately compensated for, in monetary damages and (B) would cause Company substantial and irreparable harm for which it would not have an adequate remedy at law; (ii) Company accordingly will be entitled to obtain equitable relief against Artist (including temporary restraining orders, preliminary and permanent injunctive relief, and specific performance), in addition to all other remedies that Company may have, to enforce this Agreement and protect its right hereunder; and (iii) Artist accordingly may not assign any of its rights or obligations hereunder. You agree not to contest in any court or other judicial forum any of the matters stated in clause (i) above.

14. **Independent Contractor Status.**

Nothing herein and no actions taken or omitted to be taken hereunder by Company or any of its affiliates or designees (on the one hand) or by Artist (on the other hand) will be deemed to constitute any such party as the employee, agent, representative or joint venturer of the other. Artist is and will be an independent contractor when rendering services and at all other times hereunder. Accordingly, Artist understands that: (i) monies due hereunder will be paid to Artist without withholding any federal, state, foreign or other taxes or assessments (including income, social security and unemployment taxes), unless any such withholding is required by any domestic or foreign governmental authority; and (ii) Artist will be solely responsible for all such taxes and assessments, to the extent not withheld by Company, which may at any time be owed in connection with such monies. No laws, statutes, rules or regulations in the nature of workers' compensation acts are intended to apply under this Agreement, and Company will carry no workers' compensation, health, accident or other insurance on behalf of Artist.

15. **Cure of Breach.**

No party hereto will be entitled to assert that the other party has committed  any breach of this Agreement, or to file or otherwise commence any court or other judicial proceeding in respect of that breach, unless: (i) such first party gives, to the alleged breaching party, a written notice that identifies both the alleged breach in reasonable detail and the provision(s) of this Agreement allegedly violated; and (ii) the alleged breaching party has failed to cure substantially the alleged violation within forty-five (45) days after such notice has been given; provided that such cure period will be fifteen (15) days in the case of any alleged failure by one party to pay to (or on behalf of) the other party, or to reimburse the other party for, any monies due and owing hereunder in an amount exceeding ten thousand dollars ($10,000). This Section 14 will in no way limit or restrict the right of Company, however, to seek immediate equitable relief against Artist as and to the extent Company deems appropriate to enforce this Agreement or protect its right hereunder.

16.   **Group Provisions.**

If Artist on the date hereof is, or during the Term becomes (in accordance with the next sentence), a group consisting of two or more members, then the term "Artist" shall mean, whenever used herein, each member of the Artist individually and severally and all members of the Artist's group jointly, unless the context expressly specifies otherwise.  During the Term,  no person shall for any reason be added to Artist, or substituted for any member of Artist's group, unless such person agrees to be bound with Artist, both individually and jointly, by this Agreement and executes and delivers to Company such documents as Company deems necessary to evidence such agreement.  Artist shall cause any such person to execute and deliver such documents, and Company's rights hereunder shall not be diminished by such person's failure or refusal to do so.  Any breach of this Agreement by any member of Artist shall be deemed a breach by all members of Artist.

17.   **Notices.**  Any notice, request, consent, approval, claim, demand or other communication that is required or permitted to be given hereunder (a "Notice") shall be in writing and shall be given, made or sent either by: (i) delivery in person (by a third party delivery service and with written verification of delivery thereby); (ii) FedEx, Airborne, DHL, UPS or a similar overnight delivery service; (iii) registered mail; (iv) certified mail (postage prepaid, return receipt requested); or (v) facsimile transmission to a fax telephone number at the addressee's then-current principal business address (provided that the original or a copy of such transmission is subsequently delivered by one of the other methods specified above). A copy of any notice to Company shall be delivered in the same manner to: The Pina Firm, LLC, Attn: Stephen A. Pina, Esq., 444 N. 3rd Street, Suite 110, Philadelphia, Pa. 19123. Notice shall be deemed given when received by the addressee at its address set forth in the first paragraph of this Agreement (or at such other address therefore as has been specified by like notice). Notwithstanding the foregoing, accounting statements and payments hereunder may be delivered by regular mail, and no failure to send any requested courtesy copy (e.g., to a party's counsel, accountant or other representative) shall constitute a breach hereof or in any way impair the effectiveness of the Notice concerned,

18. **Miscellaneous.**

(a)     This Agreement: (i) will be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs, estates, administrators and executors; (ii) embodies the sole and entire agreement of the parties in respect of, and supersedes all prior oral or written understandings between them concerning the subject matter hereof, and (iii) may not be canceled, amended, discharged or waived, in whole or part, except by a written instrument signed by all parties hereto.

(b)     This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New Jersey (without giving effect to any of such State's principles regarding conflict of laws).

(1)     In respect of any action or proceeding arising out of or relating to this Agreement or instituted hereunder or based upon any document subsequently delivered pursuant hereto (an "Action"), Company and you irrevocably (i) consent to the jurisdiction of any state or federal court located within New Jersey, and (ii) waive any objection to venue, or to the inconvenience of the forum, of any such court,

(2)     Any process in any such Action may (in addition to methods permitted by law) be served upon any party hereto by delivering it by any method permitted under Section 16 hereof. Any such service shall be deemed to have the same force and effect as personal service within the State of New Jersey.

(c)     A party's failure to comply, or its delay in complying or its failure to comply timely, with any obligation, covenant or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by such party. Except to the extent that any such instrument shall expressly provide otherwise, neither any waiver of any such failure of compliance, nor any other failure to insist upon strict or timely compliance with any obligation, covenant or condition herein, nor any delay in insisting upon such strict or timely compliance, will operate as a waiver of, or estoppel with respect to, any subsequent or other such failure. In addition, no failure or delay on the part of any party to exercise any right, remedy, power or privilege hereunder will operate as a waiver thereof unless the same is subsequently expressly waived in a written instrument signed by such party.

(d)     Within five (5) days after Company's request therefore, you will execute, acknowledge and deliver to Company such further documents (including any inducement agreements, consents or similar documents required in connection with the Distribution Agreement) as Company may reasonably require in order (i) to evidence, perfect or effectuate further Company's rights hereunder, (ii) to enable Company to fulfill its obligations under the Distribution Agreement or (iii) otherwise to carry out the purposes and intent of this Agreement.

(e)     Company will be entitled to assign, grant or otherwise transfer this Agreement or any of Company's rights or obligations hereunder, in whole or in part, to any third party without any restriction whatsoever,

(f)     If one or more provisions of this Agreement are held to be illegal or unenforceable under applicable New Jersey law, such illegal or unenforceable portion(s) will be limited or excluded from this Agreement to the minimum extent required so that this Agreement will otherwise remain in full force and effect and enforceable in accordance with its terms.

(g)     Neither this Agreement nor any instrument, document or other communication subsequently delivered pursuant hereto or in connection herewith will constitute a partnership, joint venture, agency, fiduciary or similar relationship between Company and Artist.

(h)     Except (i) as required in connection with a court or other judicial or governmental proceeding or (ii) with the prior written consent of Company, Artist will not make any disclosure of any terms or conditions of this Agreement, the Distribution Agreement or any other document delivered pursuant hereto or thereto, except to Artist's attorneys and accountants on a need-to-know basis,

19. **Legal Representation.**  Each party acknowledges that (a) it has either (i) retained separate and independent counsel and has been fully advised regarding every aspect of this Agreement, or (ii) was advised by the other party to retain separate and independent counsel but chose not to retain said counsel; (b) neither party in any sense participated in the selection of the other party's counsel or, if applicable, the other party's decision not to retain counsel; (c) it has read and understood this agreement; and (d) it believes the provisions of this Agreement to be fair and equitable. **For the avoidance of doubt, Artist expressly acknowledges that all the percentages and rights granted are accurate as Artist is a 50% owner of Company and therefore waives any and all industry standard advance, royalty, accounting, publishing, ancillary and other customary income splits.**

20. **WEBSITE**

Company and its Licensees shall have the right, throughout the world, and shall have the right to authorize other Persons, to create, maintain and host web sites relating to the Artist (including without limitation a MySpace site) and to register and use the name "_____.com" and any variations thereof which embody the Artist's name as Uniform Resource Locators (or "URLs"), addresses or domain names for each web site created by Company in respect of the Artist (each an "Artist Site"). All such web sites and all rights thereto and derived therefrom shall be Company's property throughout the Territory. Company will assign to you all rights in and to the "_____.com" URL at the expiration or termination of the Term, provided Company shall have the non-exclusive right to use such URL after the Term, and further provided Company may create, maintain, register and use an alternative URL (and Artist web site) after the Term. You may maintain a web site for the Artist, so long as the URL is not "_____.com" and provided you do not advertise such site as the "Exclusive Artist Web Site." If any person challenges the Artist's right to use Artist's professional name, or if Artist desires to change Artist's name (subject to Company's prior written approval), Company will have the right to create, maintain and host a web site and to register and use Artist's new name in a web site such as "_____.com."

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**COMPANY:**

IN THE STRUGGLE PRODUCTIONS, LLC

By _____
    Jose Trespalacios

JAMEELAH B. HARDIN
ID # 2398725
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 7/28/2015

**ARTIST:**

By _____
    Ruben D. Sosa, Jr.

SS# █████████████████████

## EXHIBIT A

Existing Compositions
COMPOSITION                    WRITERS    %              PUBLISHERS  %

1.

2.

3.

4.

5.

Recording Agreement                                      Page 19 of 22

EXHIBIT "B"

ASSIGNMENT OF COPYRIGHT

       For and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby irrevocably sells, assigns, transfers, sets over and conveys to In The Struggle Productions, LLC, or its assignees or designees (collectively "Publisher") and their successors and assigns (subject to the terms of that certain agreement between Publisher and Ruben (the "Writer") of even date herewith) (the "Agreement"), one hundred percent (100%) of the undersigned's undivided right, title and interest in the entire worldwide copyright and all other rights, including any renewals, extensions and reversions of copyright including the right to administer the Compositions and all other rights in and to all Compositions written by Writer as described in the Agreement, including the title, music and lyrics thereof.

       IN WITNESS THEREOF, the undersigned has caused the transfer of copyright to be executed this ___ day of _____, 2012.

By: _____
              Ruben D. Sosa, Jr.

County of _Hudson_

State of _New Jersey_

       On the _19th_ day of _January_, 2012, before me personally came _Ruben D. Sosa_, known to me to be the person named in and who executed the foregoing agreement, and who has acknowledged to me that he has executed same.

_____
Notary Public

JAMEELAH B. HARDIN
ID # 2398725
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 7/28/2015

EXHIBIT C

Recording Agreement                       Page 20 of 22

**Form of Letter of Direction to Record Manufactures and Others**

TO:    ALL RECORD MANUFACTURERS LICENSED TO MECHANICALLY
          REPRODUCE THE COMPOSITIONS SPECIFIED BELOW

TO:    THE HARRY FOX AGENCY

TO:    ALL OTHER PARTIES IN INTEREST

DATED: _____, 2012

       Please be advised that, pursuant to the terms of a Recording Agreement, dated as of _____, 2012 effective as of that date, I have granted to In The Struggle Productions, LLC and its licensees, successors and assigns the exclusive right throughout the world to do the following things in respect of all compositions of which the undersigned is the copyright proprietor, including those compositions listed on Annex A hereto (the "Compositions")

    1.    To license and cause others to license the use of the Compositions;
    2.    To administer and grant rights in and to the Compositions and the copyrights therein;
    3.    To publish and sell sheet music and/or folios of the Compositions;
    4.    To collect all monies payable with respect to the Compositions and the copyrights therein, including monies earned but not paid prior to the effective date hereof (other than public performance royalties that may be payable by a performing rights society directly to writers) and;
    5.    To administer otherwise the Compositions and the copyrights therein and to act as the publisher thereof.

Very truly yours,

_____

**Ruben D. Sosa, Jr.**

S.S. #: ███████████████

[Writer's Music Publishing Designee, If Any]

By: _____

(An Authorized Signatory) **Ruben D. Sosa, Jr.**

<u>**Form of Letter of Direction to Performing Rights Societies**</u>

Dated: As of _____, 2012

TO:    American Society of Composers, Authors and Publishers
One Lincoln Plaza
New York, New York 10023

[OR, IF APPLICABLE]

       Broadcast Music Incorporated
320 West 57th Street
New York, New York 10019

Gentlemen:

You are hereby authorized and directed to pay In The Struggle Productions, LLC (together with its licensees and their respective successors and assigns, the "<u>Administrator</u>") whose address is 29 Park Avenue Carteret NJ 07008, and the undersigned hereby assigns to the Administrator, all monies payable at any time (regardless of when earned) as the publisher's share of public performance royalties with respect to all compositions written by **Cito On The Beat**, which are co-owned by the Administrator and the undersigned.

       The foregoing authorization and direction shall remain in full force and effect under the terms and conditions of a Recording Agreement, of even date hereof, between the undersigned and the Administrator, until modified or terminated in a written instrument executed by the undersigned and the Administrator.

Very truly yours,

_____

**Ruben D. Sosa, Jr.**
S.S. #: ▮▮▮▮▮▮▮▮▮▮

[Writer's Music Publishing Designee, If Any]

By: _____
    (An Authorized Signatory) **Ruben D. Sosa, Jr.**

**<u>EXHIBIT D</u>**

## PRODUCER AGREEMENT

This Producer Agreement ("**Agreement**") dated as of January 1, 2023 sets forth the material terms of the agreement between ▆▆▆▆ ("**we**," "**Company**," or "**us**") and In The Struggle Productions, LLC ("**Lender**" or "**you**") f/s/o Ruben D. Sosa, Jr. p/k/a "Cito on the Beat" a/k/a "Citoonthebeat" ("**Producer**") for Producer's non-exclusive services in connection with the sound recordings set forth below featuring the recorded performances of Ms. ▆▆▆▆ ("**Artist**") recorded in connection with and/or for possible inclusion on, among other things, Artist's upcoming release (the "**Release**") subject to Artist's exclusive recording agreement with Company, dated as of January 13, 2019, as amended ("**Recording Agreement**"). Capitalized terms used but not specifically defined herein shall have the meaning(s) ascribed to them in the Recording Agreement and in the event of any discrepancy, the definitions set forth in this Agreement shall be deemed controlling. Lender and Company agree to the following:

| 1. COMPANY: | ▆▆▆▆ | |
|---|---|---|
| 2. PRODUCER: | Ruben D. Sosa, Jr. p/k/a "Cito on the Beat" a/k/a "Citoonthebeat" | |
| 3. COMPANY ADDRESS: | ▆▆▆▆ | ▆▆▆▆ |
| 4. LENDER ADDRESS: | In the Struggle Productions, LLC<br>123 Town Square Place, Suite #107<br>Jersey City, NJ 07310 | Contact: Jose Trespalacios |

| 5. COMPOSITIONS / SOUND RECORDINGS: | ▆▆▆▆ sound recordings (each, a "**Sound Recording**" and collectively, the "**Sound Recordings**") embodying Artist's featured performances of the musical compositions titled "2 Freaky," "Stingy," and "DND" as listed on Schedule 1 (each, a "**Composition**") attached hereto and made a part hereof. |
|---|---|
| 6. SERVICES: | Lender shall instruct Producer to perform all non-exclusive services in connection with the Sound Recordings as are customarily performed by producers in the recording industry. The Sound Recordings shall be commercially and technically satisfactory to Company for the manufacture and sale of records. Company hereby acknowledges the full delivery and acceptance of the commercially and technically satisfactory Sound Recordings hereunder within the approved budget and without excess costs, provided the foregoing acknowledgement shall not in any way prejudice Company's rights hereunder in the event of any breach of Producer's representations, warranties, and covenants set forth in this Agreement.<br><br>It is understood that Lender shall use best efforts and shall instruct Producer to use best efforts to provide requested delivery elements including, but not limited to, session files and releases, mixes, radio edits, sample clearances, and all documentation reasonably required by us to perfect our rights in and to the Sound Recordings as sole owner and copyright holder thereof, to timely comply with applicable law, all union requirements (including providing such unions with the appropriate credit for all performers on the Sound Recordings, identifying their performances), at Company's sole cost (if any). |

| 7. ADVANCE / ROYALTY: | Advance. Lender hereby acknowledges receipt of a recoupable advance of ▆▆▆▆ per Sound Recording for a total of ▆▆▆▆ (the "**Advance**").<br><br>Royalty. In addition to the Advance, Company shall pay to Lender a royalty in the amount of ▆▆▆▆ ercent of the net royalties received by Artist (the "**Base Rate**") of PPD (as defined in the "Producer Royalty Provisions", attached as Schedule 2 and made a part hereof) on top-line USNRC Net Sales of Records (as defined in the Recording Agreement, the relevant provisions of which including without limitation, royalty calculation, accounting, audit and controlled composition provisions and all relevant definitions are attached hereto as Exhibit A and incorporated by reference herein the "**Recording Agreement Extracts**") ("**Producer's Royalty**"). Notwithstanding the foregoing, with respect to non-USNRC sales and exploitations of records embodying solely a Sound Recording for which Artist is paid or credited, Producer's Royalty shall be ▆▆▆▆ %) of Artist's respective share of Company's Net Receipts. The term "**Net Receipts**" shall be defined as all monies actually received by Company from the exploitation and/or distribution of a Sound Recording, less any and all direct, out of pocket costs and expenses incurred by Company in connection with the production, mixing, mastering, manufacture, licensing, exploitation, distribution, and marketing of the Sound Recordings, including, without limitation, the Advance, distribution fees, credit card processing fees, bank charges, payments and/or royalties |

1

(c) Company shall have the right, at its election, to assign this Agreement and/or any of Company's rights hereunder, in whole or in part, to any person or entity, provided Company remains secondarily liable. Lender shall not have the right to assign any of Lender's or Producer's obligations or rights hereunder, absent the express consent of Company, except for the one-time right to assign payment to an entity wholly owned by Lender or Producer.

(d) This Agreement supersedes all prior agreements between the parties pertaining to the subject matter hereof, whether verbal or written, and any further modification(s) to this Agreement shall not be binding unless in writing and signed by the parties hereto. This Agreement may be signed in any number of counterparts, each such counterpart being deemed to be an original instrument, but all of which shall constitute one document. Delivery of a signed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be deemed effective as delivery of a manually executed original counterpart of this Agreement.

(e) All notices to be given by either party hereunder shall be in writing and shall be delivered by hand or by United States certified mail, postage prepaid, return receipt requested, to the address of each party as first set forth above until notice of a new address shall be duly given, except that royalty statements and any payments due hereunder, shall be sent to you at such address by regular mail. A copy of all notices to Producer and/or Lender shall also be sent to: Justin M. Jacobson, Esq., Law Office of Justin M. Jacobson, Esq., 7 Penn Plaza, Suite #420, New York, NY 10001.

(f) The parties acknowledge that they have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed consistent with the joint drafting of this Agreement by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(g) Any waiver by either party of any term or condition of this Agreement shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.

(h) Should any paragraph or provision of this Agreement be held to be void, voidable, invalid or inoperative, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, voidable, invalid or inoperative paragraph or provision had not been contained herein.

(i) All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and one of them shall not be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

**AGREED AND ACCEPTED:**

By: ▮▮▮▮▮▮▮   An Authorized signatory

**AGREED AND ACCEPTED:**

In The Struggle Productions, LLC

By: Jose Trespalacios, An Authorized Signatory

6

(c) Company shall have the right, at its election, to assign this Agreement and/or any of Company's rights hereunder, in whole or in part, to any person or entity, provided Company remains secondarily liable. Lender shall not have the right to assign any of Lender's or Producer's obligations or rights hereunder, absent the express consent of Company, except for the one-time right to assign payment to an entity wholly owned by Lender or Producer.

(d) This Agreement supersedes all prior agreements between the parties pertaining to the subject matter hereof, whether verbal or written, and any further modification(s) to this Agreement shall not be binding unless in writing and signed by the parties hereto. This Agreement may be signed in any number of counterparts, each such counterpart being deemed to be an original instrument, but all of which shall constitute one document. Delivery of a signed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be deemed effective as delivery of a manually executed original counterpart of this Agreement.

(e) All notices to be given by either party hereunder shall be in writing and shall be delivered by hand or by United States certified mail, postage prepaid, return receipt requested, to the address of each party as first set forth above until notice of a new address shall be duly given, except that royalty statements and any payments due hereunder, shall be sent to you at such address by regular mail. A copy of all notices to Producer and/or Lender shall also be sent to: Justin M. Jacobson, Esq., Law Office of Justin M. Jacobson, Esq., 7 Penn Plaza, Suite #420, New York, NY 10001.

(f) The parties acknowledge that they have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed consistent with the joint drafting of this Agreement by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(g) Any waiver by either party of any term or condition of this Agreement shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.

(h) Should any paragraph or provision of this Agreement be held to be void, voidable, invalid or inoperative, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, voidable, invalid or inoperative paragraph or provision had not been contained herein.

(i) All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and one of them shall not be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

AGREED AND ACCEPTED:

▅▅▅▅▅▅

▅▅▅▅▅▅▅▅, An Authorized signatory

AGREED AND ACCEPTED:

In The Struggle Productions, LLC

By: José Trespalacios, An Authorized Signatory

<u>**Schedule 1**</u>
Sound Recordings and Compositions, Ownership of Compositions, and Credit

| Sound Recording / Composition | Ownership of Composition | Credit |
|---|---|---|
| ██ ██ | ████ ████ <br><br> Ruben D. Sosa (BMI) - IPI # 831593923 – 50% | Produced by Citoonthebeat |
| ' ██ | ████ ████ <br><br> Ruben D. Sosa (BMI) - IPI # 831593923 – 50% | Produced by Citoonthebeat |
| ' ██ | ████ ████ <br><br> Ruben D. Sosa (BMI) - IPI # 831593923 – 50% | Produced by Citoonthebeat |

7

**EXHIBIT B**
**SoundExchange, Inc.**
**Letter of Direction**

Solely as a service and accommodation to those featured artists entitled to royalties under 17 U.S.C. § 114(g)(2)(D) who specifically authorize SoundExchange to collect and distribute royalties on their behalf, SoundExchange permits such featured artists to designate that a percentage of the royalties due them from SoundExchange relating to certain sound recordings be remitted to creative personnel (i.e., producers, mixers, or engineers) credited or recognized publicly for the commercially released sound recording on which the featured artist performs.

Please note that a **performer** need not execute this Letter of Direction in order to be paid statutory royalties by **SoundExchange.**

To make such a designation, the performer submitting this Letter of Direction ("LOD") must be registered with SoundExchange.

Sections with asterisks are required.

*Name of Solo Artist(s) or Group on recording(s): ▇▇▇ _____

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇    ▇▇▇▇▇▇▇▇ _____

*Name of Producer, Mixer or Engineer ("Payee") – **Ruben D. Sosa, Jr. p/k/a "Cito on the Beat" a/k/a "Citoonthebeat"**

* Required if paying to a company: ☒ I certify that company listed above is owned solely by the producer, mixer, or engineer involved in the creative process for the recordings listed in the attached LOD Repertoire Chart.

Payee ID (If known):   ▇▇▇▇▇ _____

*Payee Address – include c/o's here: <u>c/o In The Struggle Productions, Inc. 123 Town Square Place, Suite 107, Jersey City, NJ 07310</u>

Payee Telephone Number:▇▇▇▇▇ _____

▇▇▇▇▇▇    ▇▇▇▇▇▇▇▇▇

*An LOD Repertoire Chart is required to complete the LOD.  Please submit a complete LOD Repertoire Chart along with all the pages in this Letter of Direction.

*Effective Date: (choose one)

☐ Check here if this LOD applies to payments as of _____ [date]
☒ Check here if this LOD applies retroactively for all tracks listed on the LOD Repertoire Chart.
☐ Check here if the Effective Payment Date varies by track.  Enter the Effective Dates on the LOD Repertoire Chart.

Please note that retroactive application of an LOD is limited to available SoundExchange royalties for the tracks listed on the LOD Repertoire Chart.

*Payment Percentage ("Percentage"): check applicable box

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
 Percentage varies by each track covered by this LOD.  Enter percentages on the LOD Repertoire Chart.

11

**EXHIBIT A**

**INDUCEMENT**

In order to induce and ████████████. (the "**Company**") to enter into the foregoing Producer Agreement ("**Agreement**") with In The Struggle Productions, LLC ("**Lender**") furnishing the services of f/s/o Ruben D. Sosa, Jr. p/k/a "Cito on the Beat" a/k/a "Citoonthebeat" (the "**Producer**") the undersigned hereby:

1. Acknowledges that the undersigned has read and is familiar with all of the terms and conditions of the Agreement and hereby ratifies and confirms all representations, warranties and agreements of Lender therein;

2. Assents to the execution of the Agreement and agrees to be bound by the terms and conditions thereof, including but not limited to, each and every provision of the Agreement that relates to the undersigned in any way, directly or indirectly, the services to be rendered thereunder by the undersigned and restrictions imposed upon the undersigned in accordance with the provisions of the Agreement;

3. Guarantees to the Company the full and faithful performance of all the terms and conditions of the Agreement by the undersigned and Lender (including, without limitation, all representations, warranties and indemnification obligations set forth in the Agreement); and

4. Acknowledges and agrees that Company or the Artist shall be under no obligation to make any payments to the undersigned or otherwise, for or in connection with this inducement, for or in connection with the services rendered by the undersigned, and/or in connection with the fulfillment of the undersigned's obligations pursuant to the Agreement and the rights granted to Company thereunder and that the undersigned shall look solely to Lender for payment of any sums due to the undersigned in connection with his services under the Agreement.

AGREED AND ACCEPTED:

Ruben D. Sosa, Jr. p/k/a "Cito on the Beat" a/k/a "Citoonthebeat"